IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:21-cr-39 |
| | ) | |
| JULIE ANN JOHNSON and | ) | |
| JACQUELINE RENEE EXLEY | ) | |

MEMORANDUM OPINION RE:
MOTIONS AT ECF NOS. 771 and 773

**Susan Paradise Baxter, United States District Judge**

On February 23, 2021, during a search of the West Erie Plaza office of Hertel & Brown Physical and Aquatic Therapy, officers interviewed employees Julie Ann Johnson ("Johnson") and Jacqueline Renee Exley ("Exley"). Having subsequently been indicted in connection with this case, Johnson and Exley have filed motions to suppress their statements. The Court has received briefing and held evidentiary hearings on August 29 and September 25, 2024. For the reasons that follow, the Defendants' motions will be denied.

## I.    BACKGROUND

At the hearing, the Government presented testimony from retired FBI Special Agents Michael Thoreson and Jim Rogers, as well as Supervisory Agent Mark Beneski. The defense offered testimony from witness Karen Rose, a former employee of HB. In addition, the Court received various exhibits, which it has reviewed.

On a motion to suppress evidence, the trial court is the finder of fact and must determine the credibility of witnesses, weigh the evidence, and reach "any inferences, deductions and conclusions to be drawn from the evidence." *United States v. Cole*, 425 F. Supp. 3d 468, 473 (W.D. Pa. 2019). As the finder of fact, the Court "is free to accept or reject any or all of a

witness's testimony." United States v. *Murphy*, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005) (citation omitted). The Court makes its credibility determinations by considering "numerous factors, including the witness's demeanor and manner while on the stand, the witness's ability to accurately recollect the matters at hand, the manner in which the witness may be affected by the outcome, the extent to which the witness's testimony is either supported or contradicted by other evidence and testimony in the case, and, ultimately, the extent to which it withstands a common sense test of reason and logic." *Id.* A witness' testimony is not to be judged more or less credible because the witness is a law enforcement officer. *Id.* at 569-70 (citations omitted).

Here, the Court has considered the foregoing factors and finds the testimony of the Government's witnesses to be generally credible and corroborative of one another. The agents' testimony was detailed and factual, and their demeanor on the stand was calm and professional. None of the agents appeared to exaggerate in their account of the events in question.

The Court also credits certain aspects of Ms. Rose's testimony, including her testimony that all of the HB employees other than Michael Brown gave interviews and none attempted to leave the premises prior to being interviewed. Portions of her testimony corroborated the agents' account, including the general timeline of events and the fact that no agents drew their guns, or arrested anyone, or shouted or used profane language. Some aspects of Ms. Rose's testimony, such as her description of an agent "barreling" into the office, appeared to be somewhat exaggerated. The Court also considers the fact that Ms. Rose may harbor a potential bias in favor of the Defendants with whom she worked for several years.

During the hearing, Ms. Rose offered hearsay testimony about statements that Defendant Johnson allegedly made the day following the agents' execution of the search warrant. This information was offered not for the truth of Johnson's account but only to establish her

demeanor, and the Court accepts it as such.  The Court does not credit the allegation that Thoreson made threatening remarks to Johnson concerning jailtime or separation from her children.  Ms. Rose also testified, contrary to Thoreson's account, that no one advised the employees they could leave the area or decline the interview.  In addition, Ms. Rose described Thoreson's tone and demeanor as loud and intimidating. To the extent her description of the events of the day differed from that of the agents, the Court attributes this to differing perceptions and recollections rather than to any deliberate untruth; however, the Court places greater reliance and credence on the testimony of Thoreson and the other agents.

Finally, the Court notes that that the Defendants proffered affidavits in support of their motions which contradict aspects of the Government's evidence.  The Court affords the affidavits no weight, however, because the Defendants' averments in the affidavits were not subjected to cross-examination, and they are in conflict with the credible live testimony of the Government's witnesses, all of whom were subjected to thorough cross-examination. *See United States v. Deleston,* No. 15-cr-113, 2015 WL 4745252, *5 (S.D.N.Y. July 24, 2015) (citing cases)

## II.     GOVERNING LEGAL STANDARDS

The Fifth Amendment to the U.S. Constitution protects against compelled self-incrimination.  U.S. Const. amend v.  To effectuate this protection, the Supreme Court held in *Miranda v. Arizona*, 384 U.S. 436 (1966), that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444.  Because a custodial interrogation involves "inherently compelling pressures," *id.* at 467, a defendant who "has been taken into custody or otherwise deprived of his

freedom of action in any significant way" must be given the warnings prescribed in *Miranda*, including the right to remain silent and the right to counsel. *Id.* at 444, 468-70.

"As a general rule, the burden of proof is on the defendant who seeks to suppress evidence." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). However, Defendants have satisfied their initial burden by alleging they were subjected to custodial questioning without the benefit of *Miranda* warnings. *United States v. Hvizdzak*, No. CR 21-30E, 2024 WL 4150099, at *6 (W.D. Pa. Sept. 11, 2024). Factually, there is no dispute that *Miranda* warnings were not administered in connection with the Defendants' questioning. Accordingly, in the context of this case, the Government now bears the burden of proving by a preponderance of the evidence that there was no custodial interrogation implicating *Miranda*. *Id.*

"To determine whether an individual was in custody, we first establish the circumstances surrounding the interrogation." *United States v. Ludwikowski*, 944 F.3d 123, 131 (3d Cir. 2019) (cleaned up). Next, "we ask, as an objective matter, whether a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave." *Id.* In other words, the Court must consider whether there was a "restraint on freedom of movement of the degree associated with a formal arrest." *Id.*

However, this "freedom-of-movement test" identifies only a necessary and not a sufficient condition for *Miranda* custody. *Id.* Courts must therefore ask the "additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.*

Even where there has been no *Miranda* violation, the Court still must determine whether Defendant's statements were voluntary. *See United States v. Swint*, 15 F.3d 286, 288-89 (3d Cir. 1994) (treating custody and voluntariness as separate inquiries). In "special circumstances," a

confession might be involuntary even if the person giving it is not in custody. *Ludwikowski*, 944 F.3d at 135.

A statement is involuntary when the suspect's "will was overborne in such a way as to render his confession the product of coercion." *Arizona v. Fulminante*, 499 U.S. 279, 288 (1991). Whether a statement is voluntarily made is determined from "the totality of all the surrounding circumstances - both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).

The prosecution has the burden of establishing, by a preponderance of the evidence, that a challenged statement was voluntary -- that is to say, that is, "the product of an essentially free and unconstrained choice." *Ludwikowski*, 944 F.3d at 135 (citation omitted). In making this determination, courts consider the officers' tactics, including "the length of detention; the repeated and prolonged nature of questioning; and the use of physical punishment such as the deprivation of food or sleep." *Halsey v. Pfeiffer*, 750 F.3d 273, 303 (3d Cir. 2014) (quoting *Miller v. Fenton*, 796 F.2d 598, 604 (3d Cir. 1986)). Courts also consider the defendant's characteristics, such as youth, lack of education or low intelligence, lack of advice concerning his/her constitutional rights, and background/experience, including prior dealings with the criminal justice system. *Ludwikowski*, 944 F.3d at 135. All these factors assist in answering the "ultimate question" -- namely, "whether the defendant's will was overborne when he confessed." *Id.* (cleaned up); *see Miller*, 796 F.2d at 605 (The overriding question in evaluating voluntariness is whether the law enforcement officer's tactics and statements "were so manipulative or coercive that they deprived [the defendant] of his ability to make an unconstrained, autonomous decision to confess.").

### III.    ANALYSIS

*A.   The Circumstances of the Interviews*

On morning of February 23, 2021, agents arrived at the West Erie Plaza offices of HB at approximately 9:00 a.m. to execute a search warrant. Several unmarked police vans parked in a lane directly in front of entrance, though not blocking the entrance. The vans were visible to those inside the office because there were large windows at the front of the facility. Approximately eleven law enforcement agents were on site, along with six support personnel.

The agents entered the building first and began fanning out as they interacted with the occupants inside. SA Thoreson explained the presence of the law enforcement officers and the fact that they had a search warrant for the facility. He began directing patients and employees to the front area of the office in an attempt to clear the area for officer safety and get all of the occupants to one place where he could better explain what was going on.

While some of the officers were wearing shirts or jackets identifying them as law enforcement, Thoreson was wearing an Air Force Base shirt and pants. His gun was holstered and covered by his shirt, so it was not visible, and his badge was not displayed. Although all of the officers were armed, no weapons were ever drawn or brandished in front of the occupants.

As he was speaking to the occupants inside the facility, Thoreson raised his voice to get the people's attention; however, his tone was professional. He did not yell or scream at anyone or physically place his hands on anyone inside the building. A group of no more than 20 individuals was directed to a large area in the front of the practice. Thoreson apologized and advised the individuals that they were not under arrest and were free to go, and that he did not know how long the officers would be present at the office.

Although the agents did not shut down the practice for the day, at some point one of the HB employees contacted patients who were scheduled to come in that day and called off their appointments. Supervisory Agent Beneski stood at the front door of the facility to address potential issues with the press and turn away patients who might show up for their scheduled appointments. However, the front door was never locked, nor was any occupant prevented from leaving. The door at the rear of the facility was unlocked and unmanned. Michael Brown departed at some point during the search, possibly out of the rear exit.

While the agents were on premises, all employees had their photos taken and contact information recorded. While the search was ongoing, Special Agents Thoreson and Rogers conducted interviews of employees. All patients and employees departed the building by 11:30 a.m. The agents remained on premises until later that evening.

    B.  *Whether a Reasonable Person Would Have Felt Free to Terminate the Interview and Leave*

Having discussed the general circumstances under which the Defendants were questioned, the Court considers whether a reasonable person in the same circumstances would have felt free to leave. The Court's analysis depends on numerous factors such as:

> the interview's location, physical surroundings, and duration; whether [the interviewee] voluntarily participated; whether he was physically restrained; whether other coercive tactics were used, such as hostile tones of voice or the display of weapons; and whether the interviewee was released when the questioning was over. *Id.; United States v. Willaman*, 437 F.3d 354, 359-60 (3d Cir. 2006). We also consider whether the questioner believed the interviewee was guilty; whether the interviewee was specifically told he was not under arrest; and whether he agreed to meet knowing that he would be questioned about a criminal offense. *Jacobs*, 431 F.3d at 105-06.

*Ludwikowski*, 944 F.3d at 132. The Court will address each Defendant separately.

(i)    Johnson

Johnson was interviewed on premises at her place of employment by Agent Rogers initially. The Court credits Agent Thoreson's testimony that, as he encountered patients and employees and ushered them to the front of the building, he advised that they were free to leave and were not under arrest. The Court also credits agent Rogers' testimony that he began his encounter with Johnson by asking if she would be comfortable answering some questions and she indicated that she would be. The Court finds that Johnson voluntarily participated in the interview with Rogers.

The interview occurred inside an examination room with just Rodgers and Johnson present. The entire interview lasted about 90 minutes and during this time Rogers had a cordial tone and a relaxed and calm demeanor with Johnson. He did not raise his voice, use vulgarity, or accuse her of lying. He never threatened arrest or indicated that she could not leave or that she had to answer his questions. And Johnson never expressed any unwillingness or reluctance to speak with Rogers.

After about an hour of speaking with Johnson, Rogers left the exam room for the purpose of consulting with Thoreson. Rogers advised Thoreson that Johnson was claiming everything was fine at the practice and asked Thoreson if he wanted to speak with Johnson. Thoreson then entered the exam room and sat down with Rogers also present in the room. Thoreson told Johnson that the agents knew what was going on at the practice and he knew she was not being truthful and she might want to reconsider what she had told Agent Rogers. This encounter lasted only a few minutes, during which time Thoreson used a firm, matter-of-fact tone but did not raise his voice or shout at Johnson or threaten her with charges. Thoreson then left the room. Rogers gave Johnson some time alone to think, then reentered the exam room and resumed the interview

for another 20 minutes before concluding it. Thoreson returned briefly a second time to thank Johnson for being honest.

During his interaction with Johnson, Rogers was not confrontational because Johnson had been very willing to talk to him. Johnson was never handcuffed, physically restrained or touched in any manner during the interview. No weapons were drawn or brandished during the exchange. Johnson never asked to leave the interview. She never asked for her phone, never asked for a break, and never invoked her legal rights. The door to the interview room was closed for privacy but not locked and Rogers did not block the doorway. At the conclusion of the interview, Johnson was allowed to leave.

Although Thoreson indicated in some manner to Johnson that he did not believe she was initially being truthful, Johnson was not at that time a suspect, as the investigation was targeted at HB, Michael Brown, and Aaron Hertel. Notwithstanding this, the Court finds that when Johnson agreed to speak with Rogers, she must have known -- by virtue of the agents' search warrant activities -- that she would be questioned about potential criminal activity. Nevertheless, as discussed, she voluntarily agreed to speak with him.

In sum, the Court finds that Johnson was told she was not under arrest, and she in fact was not arrested or restrained at the conclusion of her interview. She was interviewed at her workplace, a familiar environment, in a setting that was mostly nonconfrontational. To the extent Thoreson did confront Johnson about his knowledge of the case and her need to be truthful, the Court finds that this is not enough to suggest that Johnson was overcome by coercive tactics.[1] Though Thoreson was direct with her, he was seated and did not yell, stand

---

[1] This is not a case where, e.g., agents "repeatedly expressed their collective belief that [the defendant] was guilty" and "supported this belief with multiple references to substantial evidence." *United Stats v. Beasley*, Criminal No. 20-361, 2023 WL 5984285, at *18 (E.D. Pa. Sept.14, 2023). Thus, the Court finds no basis for concluding that the agents' "views and beliefs were clearly manifested to the individual under interrogation and would have affected

over her, threaten her, insult her, or otherwise engage in hostile or coercive behavior. Johnson voluntarily submitted to questioning under circumstances where she should have known that the questioning would concern potential criminal activity at HB.

Based on the Court's consideration of the totality of these factors, a reasonable person in Johnson's position would have felt free to terminate the interview and leave. The agents therefore did not effectuate "a restraint on Johnson's freedom of movement of a degree associated with a formal arrest." *Ludwikowski*, 944 F.3d at 131. The Court also finds that the environment of Johnson's interview did not "present[ ] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.*

(ii)    Exley

Like Johnson, Exley was interviewed on the premises of her workplace. Again, the Court credits Agent Thoreson's testimony that, as he encountered patients and employees and ushered them to the front of the building, he advised that they were free to leave and were not under arrest. At some point while employees were being interviewed, Thoreson encountered Exley in the front waiting area and asked her if she wanted to speak with him. She advised that she would. She did not appear agitated or upset and had no hesitation in deciding to speak with Thoreson. Exley was not a suspect at that point in time, as the investigation was focused on the business and its owners.

Thoreson and Exley proceeded to an exam room which was approximately 90 to 100 square feet. Thoreson then questioned Exley for approximately 20 to 25 minutes. During this time, Thoreson sat on an examination bed while Exley sat in a chair. The door to the exam room

---

how a reasonable person in that position would perceive his or her freedom to leave." *Id.*; *accord Hvizdzak*, 2024 WL 4150099, at *11 n. 17.

was closed for privacy but Thoreson did not block the doorway.  Thoreson was wearing a covid-related mask at the time and asked Exley if she would have a problem with Thoreson removing it during the interview, to which she consented.

Although Thoreson did not tell Exley personally that she was free to leave or that the interview was voluntary, he did tell her that she was not under arrest.  He also asked her if she had any appointments or things she needed to get to, and she indicated she did not.

After engaging in small talk to try and develop a rapport, Thoreson raised the fact that the agents had a search warrant and that a judge had determined there was probable cause to conduct a search.  He asked Exley again if she wanted to speak with him and she indicated she did, so the discussion continued.

During the 20 to 25 minutes that they spoke, Thoreson remained seated approximately 3 to 4 feet from Exley. His tone remained polite and professional.  He did not yell at Exley or curse at her or use vulgarity.  He did not employ insults or accuse her of guilt or of being a liar.  There was no need for him to be confrontational with her because she was forthcoming in providing information.

Approximately 15 or 20 minutes into the interview, Rogers knocked on the exam room door and Thoreson asked Exley if it was okay for him to step out.  Thoreson closed the door behind him, conferred with Rogers about Johnson, and then went to speak with Johnson for about five minutes.

When Thoreson returned to the exam room where he had left Exley, he sat on the exam table and shut the door for privacy. He spent only a few more minutes with Exley.  He asked if she knew why Johnson was claiming that everything was "up to par" at HB.  Exley indicated she

did not know.  At some point Thoreson made comments about "ships being sailed" and "whether individuals want to stay on the ship" or "get off the ship."

While speaking with Thoreson, Exley never asked to leave the interview.  She did not become emotional during the interview or ask to take a break or request food or drink.  Thoreson did not reference taking away her children or otherwise threaten her, touch her, handcuff her, or attempt to prevent her from leaving.  Exley was never placed under arrest and was able to leave the facility after speaking with Thoreson.

Based on the foregoing information, the relevant factors for the Court's consideration do not point toward a custodial setting.  Exley was told she was not under arrest, and she in fact was not arrested or restrained at the conclusion of her interview.  She was interviewed in a familiar setting at her workplace, and the encounter was nonconfrontational. During his relatively brief interview of Exley, Thoreson was seated and did not yell, threaten her, display his weapon, physically restrain her, or otherwise engage in hostile or coercive behavior.  Like Johnson, Exley voluntarily submitted to questioning under circumstances where she should have known that the questioning would concern potential criminal activity at HB.

Based on the Court's consideration of the totality of these factors, a reasonable person in Exley's position would have felt free to terminate the interview and leave.  The agents therefore did not effectuate "a restraint on Exley's freedom of movement of a degree associated with a formal arrest." *Ludwikowski*, 944 F.3d at 131. The Court also finds that the environment of the interview did not "present[ ] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.*

C. *Voluntariness*

As noted, the Government also has the burden to prove, by a preponderance of the evidence, that the Defendants' statements were voluntary—that is, "the product of an essentially free and unconstrained choice." *Ludwikowski*, 944 F.3d at 135 (citation omitted). In making this determination, courts consider the officers' tactics, including "the length of detention; the repeated and prolonged nature of questioning; and the use of physical punishment such as the deprivation of food or sleep." *Halsey v. Pfeiffer*, 750 F.3d 273, 303 (3d Cir. 2014) (quoting *Miller v. Fenton,* 796 F.2d 598, 604 (3d Cir. 1986)). Courts also consider the defendant's characteristics, such as youth, lack of education or low intelligence, lack of advice concerning his/her constitutional rights, and background/experience, including prior dealings with the criminal justice system. *Ludwikowski*, 944 F.3d at 135. All these factors assist in answering the "ultimate question" -- namely, "whether the defendant's will was overborne when he confessed." *Id.* (cleaned up); *see Miller*, 796 F.2d at 605 (The overriding question in evaluating voluntariness is whether the law enforcement officer's tactics and statements "were so manipulative or coercive that they deprived [the defendant] of his ability to make an unconstrained, autonomous decision to confess.").

Here, both Johnson and Exley are educated adults and licensed professionals. The interviews did not involve tactics such as a lengthy detention, repeated and prolonged questioning, or the use of physical punishment as a means of obtaining information. Based on the information discussed herein, there is no basis for inferring that the Defendants' age, educational background, intelligence, physical condition, or mental status in any way limited their ability to voluntarily speak with the agents. On the contrary, the preponderance of evidence shows that the Defendants' will was not overborne when they made inculpatory statements to the FBI agents.

## IV.    CONCLUSION

Based upon the foregoing analysis, which constitutes the Court's findings of fact and conclusions of law, the Court finds that the Government has met its burden of proving, by a preponderance of evidence, that Defendants were not in custody when they were interviewed by agents on February 23, 2021. As a result, no Fifth Amendment violation occurred by virtue of the agents' failure to administer *Miranda* warnings. The Government has also sustained its burden of proving, by a preponderance of evidence, that the Defendants' statements were given voluntarily. Accordingly, the Defendants' motions to suppress will be denied.

An appropriate order follows.


SUSAN PARADISE BAXTER
United States District Judge

14